Filed 5/25/16  In re Z.J. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Z.J., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064590 |
| Plaintiff and Respondent, | (Super.Ct.No. J249605) |
| v. | OPINION |
| D.J., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annamarie G. Pace, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant D.J. (mother) appeals from the summary denial of her August 18, 2015, Welfare and Institutions Code[1] section 388 petition, which requested in the alternative that her daughter Z.J. (child), the subject of these dependency proceedings, be placed in her care under a family maintenance plan, or that she receive reunification services. Mother also challenges the trial court's September 28, 2015, order curtailing her visitation rights.

We find no abuse of the trial court's discretion, and affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

The child came to the attention of plaintiff and appellant San Bernardino County Children and Family Services (CFS) in May 2013, when she was one month old. She was admitted to the hospital for a clavicle injury; examination revealed multiple fractures, including healing fractures to her left clavicle and her "left posterior 6th rib," as well as older metaphyseal fractures of the distal end of both femurs. According to a forensic pediatrician who examined the child, the fractures appeared, at least in part, to have been inflicted nonaccidentally. Mother was the child's primary caretaker; though she lived with her father and two brothers, she reported that she did not leave the child in their care. The father of the child was not a member of the household and had no contact with the child.

CFS took the child into protective custody on May 23, 2013, placing her with a family member. On May 28, 2013, CFS filed a section 300 petition, alleging serious

___

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

physical harm (§ 300, subd. (a)), failure to protect (*id.* subd. (b)), severe physical abuse to a child under five (*id.* subd. (e)), and no provision for support by the alleged father (*id.*, subd. (g)).[2] On May 29, 2013, the trial court detained the child and removed her from her parents. Pursuant to section 361.5, subdivisions (b) or (e), the trial court found that "no reunification services may apply" for mother. The court ordered mother to have visitation of once a week for two hours, supervised by CFS.

In the jurisdiction/disposition report, filed June 14, 2013, CFS noted that mother initially stated that she believed the child's injuries were caused by the doctor at the time of delivery. She also gave several inconsistent statements to police, eventually admitting to one instance where she had been "irritated," and likely caused the injuries to the child's legs by using excessive force in trying to dress her.

The report included information from the forensic pediatrician who examined the child, confirming that pulling on or dragging the child by her legs could have caused the femur injuries; the cause of the child's other injuries remained unknown. The doctor opined that a broken clavicle during delivery was "plausible," but the rib injury was not consistent with an injury occurring during delivery; a cracked rib was possible, but not a complete fracture, which is what the child had suffered.

In the jurisdiction/disposition report, the social worker also observed that mother was affectionate with the child and attentive to her during the one visit that had then taken place since removal. The social worker was concerned, however, by mother's

---

[2] The alleged father, later demonstrated to be the child's biological father, is not party to this appeal, and will be discussed only as necessary for context.

"rough" handling of the child's legs while changing her, noting that mother "seemed oblivious to how she was handling the child." The social worker "cautioned [mother] to be careful of the child's legs and she responded 'she's fine.'" When the social worker reminded mother that she was being observed because the child had been injured, and the child's legs were still sensitive and not casted, mother responded "'they didn't cast them because they were already healing.'" The social worker "explained that this fact does not negate [mother] from being cautious with the handling of the baby's legs." At a hearing on June 19, 2013, the trial court authorized CFS not to allow mother to change the child's diapers during visits if she continued to handle the child in an inappropriately rough manner.

At the contested jurisdictional/dispositional hearing on September 13, 2013, mother was present, but in custody; she was incarcerated on July 3, 2013, and would not be released until December 19, 2013.[3] The trial court found that the child came within section 300, subdivisions (a), (b) and (e). The trial court ordered reunification services for the child's father, but denied them to mother, pursuant to section 361.5, subdivision (b)(5).[4]

---

[3] Our record does not include information regarding the precise basis for mother's incarceration. Apparently she did suffer a criminal conviction, as she is to remain on formal probation until December 18, 2017. CFS asserts in briefing that mother was convicted of child endangerment, and mother has not disputed that assertion. However, CFS does not point to anything in the present record in support of its characterization of mother's conviction.

[4] Section 361.5, subdivision (b)(5) authorizes the court to deny reunification services to a parent if the court finds by clear and convincing evidence that "the child was

*[footnote continued on next page]*

In subsequent status reports, CFS informed the trial court that, after her release from incarceration, mother visited with the child consistently, on a weekly basis and under CFS supervision, as allowed under the trial court's visitation orders; CFS described no further incidents of rough handling of the child by mother. The child apparently had suffered no long-lasting effects from her injuries. Meanwhile, reunification efforts with the child's father were unsuccessful, for a variety of reasons irrelevant to the present appeal, leading to the termination of his services on January 29, 2015, and the setting of a section 366.26 permanency planning hearing for May 29, 2015.

In a section 366.26 report, filed on May 27, 2015, CFS recommended that the section 366.26 hearing be continued. Since being removed from mother's custody, the child spent one month placed with a relative caretaker, then was placed in nonrelative foster care. Though the social worker viewed the child as adoptable, CFS had not identified an "appropriate and approved adoptive family for placement." The trial court accepted that recommendation, continuing the section 366.26 hearing to September 28, 2015.

On August 18, 2015, mother filed her section 388 petition, requesting the child be placed in her care under a family maintenance plan, or in the alternative that she receive family reunification services. Mother had completed a 52-week child abuse prevention program and had participated in individual counseling. She stated that she has

*[footnote continued from previous page]*
*[footnote continued from previous page]*
brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent . . . ."

"maintained a consistent presence in the child's life" and asserted that she and the child are "bonded to one another." Additionally, she claimed she "has taken responsibility for her actions in this case, and has diligently attended services in order to become a better parent." The trial court summarily denied the petition, finding the requested changes not to be in the child's best interest. The trial court further noted that the child "was removed at a very young age and has never lived [with] mother since. Mother has not occupied a parental role."

At the continued section 366.26 hearing on September 28, 2015, CFS reported that it still had not found a permanent home for the child; a nonrelative family that had been a possibility had "changed their mind last minute." CFS asked for a further continuance to allow it to find the child an appropriate adoptive home, and requested the court reduce mother's visits from weekly to two times per month to help facilitate the process of the child "attach[ing] to someone else." The trial court granted CFS's requests, both with respect to a continuance, and curtailing mother's visitation.

## II. DISCUSSION

**A. The Trial Court Did Not Abuse Its Discretion by Summarily Denying Mother's Section 388 Petition.**

Mother contends the trial court abused its discretion by summarily denying her section 388 petition. For the reasons stated below, we disagree.

*1. Applicable Law and Standard of Review.*

"Section 388 permits '[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court' to petition 'for a hearing to change,

6

modify, or set aside any order of court previously made or to terminate the jurisdiction of the court' on grounds of 'change of circumstance or new evidence.' [Citation.] 'If it appears that the best interests of the child may be promoted by the proposed change of order, . . . the court shall order that a hearing be held . . . .' [Citation.] Section 388 thus gives the court two choices: (1) summarily deny the petition or (2) hold a hearing. [Citations.] In order to avoid summary denial, the petitioner must make a 'prima facie' showing of 'facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.'" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.)

There are two requirements for a prima facie showing: The petitioner must show that (1) there is a genuine change of circumstances or new evidence, and (2) a modification of a previous order would be in the best interests of the child. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) The petitioner has the burden of showing changed, not changing, circumstances. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Once reunification services have been denied or terminated, "the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

7

"We review a summary denial of a hearing on a modification petition for abuse of discretion. [Citation.] Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

*2. Analysis.*

It is questionable whether mother made a prima facie showing that new evidence or changed circumstances existed. With respect to new evidence, the circumstance that the child suffered no long-lasting effects from her injuries is fortunate, but ultimately irrelevant to whether mother should have physical care and custody over the child; the fact remains that mother inflicted multiple broken bones on a one-month old infant. Mother's showing of changed circumstances is somewhat more plausible, but still falls short of compelling. Her participation in a child abuse prevention program and individual counseling is laudable, even if it was a required condition of her probation, rather than purely voluntary. Mother apparently made some progress toward developing "healthier coping skill[s], healthier developmental parenting and positive attitudes towards the parenting process." And her visitation with the child was apparently regular (except for the period when she was incarcerated) and uneventful (with the exception of the one incident of "rough" handling of the child's legs, before she had the benefit of the child abuse prevention classes). Nevertheless, we doubt that regular, supervised visitation, plus completion of a parenting class—even one of 52 weeks duration—is sufficient for mother to demonstrate changed, as opposed to merely changing,

8

circumstances, given the seriousness of the circumstances that gave rise to the child's dependency.

In any case, even assuming a genuine change of circumstance, mother failed to make a prima facie showing that the requested changes were in the child's best interest. Fundamental to the child's interest in permanency and stability is that she be placed in a home that is physically safe. Any parent who, like mother, has previously inflicted serious, nonaccidental injuries on an infant has a hard row to hoe in showing he or she is now able to provide a home that is physically safe for a child. That showing is even more difficult where, as here, reunification services have been terminated or were never ordered, and a rebuttable presumption that continued foster care is in the child's best interest applies. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

In arguing she has made the required showing, mother points to the bond she alleges she shares with the child, developed in the month the child was in her care before removal, and in the subsequent weekly visitation. She also emphasizes that (as of the time of briefing in this appeal, at least) CFS had yet to identify a prospective adoptive home for the child; she reasons on this basis that she may be the child's "best chance of permanency." This evidence of the child's best interests, however, does not compel a conclusion different from that of the trial court, even giving it all the weight it reasonably could be given. The trial court reasonably could have concluded that, given the serious circumstances that led to the dependency, the prospects for reunification with mother were slim, despite the progress mother contended that she had made, and no matter how well her supervised visitation with the child may have gone. Though a prospective

9

adoptive family had not yet been identified, the child was considered adoptable, and it was reasonable for the trial court to give substantial weight to the circumstance that a permanent placement is more likely to be found if there are no pending obstacles to adoption, such as possible reunification with a birth parent.

In short, the trial court did not exceed the bounds of reason in denying mother's section 388 petition. We therefore will not disturb the trial court's order.

**B. The Trial Court Did Not Abuse Its Discretion by Reducing Mother's Visitation.**

Mother raises both procedural and substantive objections with respect to the trial court's order curtailing her visitation. We find no abuse of discretion.

Visitation orders are the prerogative of the juvenile court, which must always consider the best interests of the child when making them. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756-757.) "In exercising its discretion, the court is required to make a ""reasoned judgment"" and compl[y] with the "'legal principles and policies appropriate to the particular matter . . . .""'" (*In re Lee G.* (1991) 1 Cal.App.4th 17, 26-27.) We will not disturb the court's decision unless it is arbitrary, capricious, or patently absurd. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

Mother suggests, without quite asserting, that the trial court erred by modifying her visitation in the absence of a section 388 petition by CFS, citing *In re Lance V.* (2001) 90 Cal.App.4th 668 (*Lance V.*) for the proposition that a "section 388 petition [is] required to alter [a] visitation order." *Lance V.*, however, does not stand for that proposition. In that case, the Court of Appeal stated that "[w]hen a change in orders is being sought and the pertinent statutes do not otherwise provide a method for change, the

10

proper method is a motion pursuant to section 388." (*Id.* at p. 675.) It does not follow, however, that a section 388 petition must always precede a change in a prior court order. To be sure, a section 388 petition is an "appropriate procedural mechanism to use when a party seeks a modification of a court order based on new evidence or changed circumstances . . . ." (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 99.) But section 385 provides that a dependency court order "'may at any time be changed, modified, or set aside, as the judge deems meet and proper,'" after providing the parties with notice and an opportunity to be heard. (See *Nickolas F.*, *supra*, at p. 98.)

In *Lance V.*, the parent had not received notice or an opportunity to be heard, and the order at issue was reversed on that basis. (*Lance V.*, *supra*, 90 Cal.App.4th at pp. 676-677.) Here, in contrast, mother had notice that CFS was seeking a change in the visitation order. CFS requested a change in visitation in the supplemental report filed on September 24, 2015. Mother had an opportunity to be heard on the issue by filing a written opposition in advance of the September 28, 2015 hearing, or by presenting evidence or argument at that hearing (or by requesting a continuance, if she required more time to prepare a response). Mother's procedural arguments with respect to the trial court's order regarding visitation are therefore rejected.

We also reject mother's claim of error regarding the merits of the trial court's order reducing her visitation. It is hardly uncommon, and is entirely appropriate, for visitation to be decreased once the focus of the dependency has shifted from the parent's interest in reunification to the child's need for permanency and stability. (E.g. *In re S.H.* (2011) 197 Cal.App.4th 1542, 1559 (*S.H.*).) The trial court reasonably determined that

11

decreasing visitation with mother, in anticipation that the child would need to bond to a new prospective adoptive family, and to facilitate CFS's efforts to identify such a prospective adoptive family, was in the best interests of the child. (See *ibid*. [affirming order reducing visitation to twice a year for two hours, to promote attachment to new caregivers].)

Mother suggests that the absence of any "new evidence that the child suffers detriment" from their visitation requires reversal of the trial court's order. Not so. "[T]he governing statute . . . requires a detriment finding before the juvenile court is authorized to *deny* visitation; not before the juvenile court is authorized to modify a term of a previous order *granting* visitation." (*S.H.*, *supra*, 197 Cal.App.4th at 1558.) Even if the visitation with mother was not itself detrimental, the trial court could reasonably adjust its frequency and duration in light of the child's particular circumstances. Mother points to nothing that compels the conclusion the trial court's ruling exceeded the bounds of reason.

### III. DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

       HOLLENHORST
              Acting P. J.

We concur:

    MILLER
          J.

    CODRINGTON
          J.